***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. The Industrial Commission has jurisdiction to hear this case.
3. The employee-employer relationship existed between the parties at all relevant times.
4. The employer was insured by The Travelers Property and Casualty Company for workers' compensation coverage.
5. On or about 27 June 1994, plaintiff suffered a compensable injury arising out of and in the course of his employment with defendant-employer.
6. On the date of the injury, 27 June 1994, plaintiff was a serviceman for the employer and earned wages in the amount of $4,250.36 per month.
 ***********
Based upon the competent evidence of record, the undersigned make the following
 FINDINGS OF FACT
1. This case was heard before the deputy commissioner upon appeal of plaintiff from an administrative decision of a special deputy commissioner granting defendant's Form 24 application to terminate benefits to plaintiff.
2. Plaintiff was 47 years old on the date of the hearing before the deputy commissioner. He completed the 9th grade and started the 10th grade but dropped out. He was in classes, which he referred to as "special education," apparently for those with learning difficulties. He cannot read or write very well.
3. Plaintiff began working for defendant-employer in 1978 and worked there for 20 years. He was a tire builder for about 7 years and then became a serviceman. Plaintiff's job as a serviceman required repetitive lifting of tire-building materials weighing from 100 to 150 pounds without assistance and up to 300 pounds with assistance. Plaintiff supplied materials for 21 mechanics.
4. On 27 June 1994, plaintiff sustained an admittedly compensable injury by accident to his back, which caused him to miss time from work. The parties executed a Form 21 agreement for payment of compensation, which was approved by the Industrial Commission on 10 August 1994. Plaintiff returned to work in December 1994 and continued to work until 10 October 1995. At the time of his injury, plaintiff's average weekly wage was $1,062.59, which entitled plaintiff to a compensation rate of $466.00, the maximum rate for 1994.
5. After his admittedly compensable injury, plaintiff was treated conservatively by Dr. Inad Atassi at Fayetteville Neurological Clinic from 25 July 1994 through October 1995. Plaintiff underwent a lumbar laminectomy and discectomy in October 1995 for a herniated disc at L4-L5, which caused an additional period of disability from 10 October 1995 through 27 February 1996. Plaintiff returned to work at his regular job as a serviceman on or about 27 February 1996.
6. Plaintiff previously had a lumbar laminectomy in 1992 for a disc herniation at the L4-L5 level with excellent results. He was able to do the heavy lifting required by his job until his injury on 27 June 1994.
7. Plaintiff was assigned a ten percent (10%) permanent impairment disability rating to his back by Dr. Atassi for the 1994 injury. On 16 December 1994, Dr. Zane T. Walsh assigned a five percent (5%) permanent impairment disability rating to plaintiff's back. The parties averaged these ratings and plaintiff was paid 22.5 weeks of compensation based on a seven and one-half percent (7½%) permanent impairment rating to his back via a Form 26 agreement.
8. In December 1996, plaintiff returned to Dr. Atassi with complaints of moderate pain in his lower back and legs. In March 1997, he returned with similar complaints. Plaintiff reported increased low back pain when driving a vibrating, sitting type of truck at work. Plaintiff was advised to avoid frequent bending and prolonged sitting.
9. Dr. Atassi consulted Dr. Bruce Jaufmann, who saw plaintiff on 12 March 1997. Plaintiff reported that he had been able to return to his job 4 months after surgery even though he had intermittent back pain. He reported to Dr. Jaufmann that he was having severe back pain and sometimes felt like his left leg was dragging. He also reported that when he awoke that Monday, he was unable to ambulate for even short distances. Dr. Jaufmann admitted plaintiff to the hospital for further evaluation with an MRI and neurosurgical consultation. The MRI results showed an L4-L5 disc protrusion, with no evidence of nerve root compression or spinal stenosis. Plaintiff was given an epidural injection, which provided significant improvement for his pain.
10. In April 1997, plaintiff underwent a myelogram and CT scan, which showed focal impression at L4-L5 upon the anterior aspect of the thecal sac, possible disc protrusion or scarring from previous surgery, but was otherwise within normal limits. Dr. Jaufmann released plaintiff to return to work without restrictions on 18 April 1997.
11. Dr. Jaufmann suggested nerve conduction studies on 3 June 1997. These results showed chronic bilateral L5 and S1 radiculopathies and abnormal findings associated with diabetic polyneuropathy. Plaintiff had been previously diagnosed with diabetes.
12. On 11 and 12 September 1997, plaintiff participated in a functional capacity evaluation (FCE) at the request of Dr. Jaufmann. Plaintiff gave consistent maximum effort on the testing. Following the FCE, on 10 October 1997, Dr. Jaufmann released plaintiff to return to work with permanent restrictions of no lifting over 45 pounds, alternate sitting and standing, and no repetitive bending.
13. Plaintiff returned to see Dr. Jaufmann in April and September 1998, with ongoing complaints of leg and back pain. Based on restrictions given by Dr. Jaufmann, defendant-employer's plant nurse signed a "Modified Work Authorization" for plaintiff on 28 June 1998. Plaintiff's work was to be modified permanently to no lifting or carrying greater than 40 pounds without assistance; alternate work positions between sitting, standing and walking; occasional kneeling, crouching, squatting, climbing stairs; and avoiding excessive, repetitive forward trunk flexion and rotation.
14. When plaintiff saw Dr. Jaufmann on 8 January 1999, plaintiff complained that he had "very severe right lower extremity pain," which he said was much worse than previously. Dr. Jaufmann ordered a new MRI to rule out a new disc herniation. The MRI was unchanged from previous studies and Dr. Jaufmann concluded that plaintiff did not have a new herniation or any condition that warranted surgery. Plaintiff remained on light duty restrictions.
15. Dr. Jaufmann took plaintiff out of work on or about 26 February 1999. Plaintiff had been out of work for two weeks because his boss had told him they had no light duty work that he could do. Dr. Jaufmann recommended physical therapy, which provided minimal improvement of plaintiff's low back and right leg pain. Defendants reinstated temporary total disability benefits on 19 March 1999 pursuant to a Form 62.
16. On 27 June 1999, plaintiff returned to Dr. Jaufmann complaining of severe lower extremity pain. Dr. Jaufmann ordered new EMG and nerve conduction studies. He also ordered a new FCE. At the July visit, plaintiff ambulated with a cane.
17. Plaintiff's nerve conduction studies were completed on 8 August 1999 by Dr. Walsh, who found that plaintiff had diabetic neuropathy which had progressed to such an extent that he could not determine whether plaintiff's previously diagnosed radiculopathies were present.
18. The dispositive issue in this case is whether plaintiff's low back radicular pain resulting from his compensable injury and surgery is a contributing factor in his incapacity to perform his job or whether plaintiff's disability is solely related to his diabetic polyneuropathy.
19. Dr. Jaufmann testified that diabetic polyneuropathy, which is a slowly progressing problem, and plaintiff's severe bilateral L5 and S1 radiculopathies are problems that affect the same nerves and each can compound the other. Plaintiff's diabetes appears to have pre-existed his 27 June 1994 injury. He also has a history of hypertensive cardiovascular disease that resulted in a heart attack subsequent to his 1994 back surgery.
20. From December 1996 through 26 February 1999 when he was taken out of work, plaintiff consistently complained of moderate to severe low back pain, left hip pain, and bilateral lower extremity pain. The nerve conduction studies in 1997 showed chronic bilateral L5-S1 radiculopathies and also findings associated with diabetic neuropathy. The nerve conduction studies performed on 9 August 1999 showed interval progression of the diabetic polyneuropathy, more motor axon loss and subsequent distal slowing of conduction. Dr. Walsh noted that he could not determine whether plaintiff's L5-S1 radiculopathies were present due to the severity of plaintiff's diabetic neuropathy. Plaintiff's 1998 MRI showed desiccated and bulging discs at L4-L5, unchanged since the previous study in 1997. Dr. Jaufmann related plaintiff's disc problems to his 27 June 1994 injury. Based on the nerve conduction study by Dr. Walsh, Dr. Jaufmann was of the opinion that by 23 September 1999, plaintiff had two problems that contributed to the severity of his symptoms, but the diabetic polyneuropathy was plaintiff's primary problem. He also opined, however, that an EMG nerve conduction study cannot distinguish between a malfunction of the nerve based on nerve impingement or the diabetic neuropathy.
21. Plaintiff's incapacity to work since 26 February 1999 is due to the compound effect of his chronic, bilateral L5-S1 radiculopathies and his diabetic polyneuropathy. Based on plaintiff's educational level, his limited ability to read and write, his prior heavy manual labor work history, his physical limitations caused by his work-related injury and his non-work — related medical conditions, plaintiff is incapable of working in any employment.
22. Even if plaintiff did not have diabetic polyneuropathy, he would only be capable of "doing something" in the sedentary work classification, according to Dr. Jaufmann.
23. Based on plaintiff's educational level, aptitude and past work history, it would be futile for plaintiff to seek employment considering the physical limitations and pain caused by his work-related injury even if he did not have diabetic polyneuropathy.
24. The parties deposed Dr. Jaufmann on 15 November 2001. Following that deposition, defendants filed a Form 24 application to terminate compensation. Informal telephonic hearings were held on 10 April 2002 and on 17 April 2002 by the special deputy commissioner, who filed an Order approving the termination of plaintiff's benefits effective 15 March 2002. Plaintiff timely appealed the administrative decision.
 ***********
Based upon the foregoing stipulations and findings of fact, the undersigned enters the following
 CONCLUSIONS OF LAW
1. On 27 June 1994, plaintiff's average weekly wage entitled him to the maximum compensation rate in 1994 of $466.00 per week. N.C. Gen. Stat. § 97-2(5).
2. On 27 June 1994, plaintiff sustained an admittedly compensable injury to his low back, which required surgery for a herniated disc at L4-L5 in October 1995 and caused plaintiff various periods of disability. N.C. Gen. Stat. § 97-29. Plaintiff's claim was admitted on a Form 21 agreement. Plaintiff was paid temporary total disability compensation and later, permanent partial disability compensation, for a 7½ % impairment rating to his back. Defendants reinstated temporary total disability on 19 March 1999 pursuant to a Form 62. Defendants' Form 24 application to terminate compensation was improvidently allowed. N.C. Gen. Stat. § 97-2(6).
3. In an action for additional compensation for medical treatment, the medical treatment sought must be directly related to the original compensable injury. If additional medical treatment is required, a rebuttable presumption arises that the treatment is directly related to the original compensable injury and the employer has the burden of producing evidence showing the treatment is not directly related to the compensable injury. Parsons v. Pantry, Inc., 126 N.C. App. 540, 541-42,485 S.E.2d 867, 869 (1997). Here, defendants admitted the claim on a Form 21 and acknowledged plaintiff's continuing disability when compensation was reinstated on the Form 62. It is defendants' burden to rebut through medical and other evidence either that plaintiff's disability is not related to his admittedly compensable injury by accident. Id. Defendants have not met their burden of proof. Moreover, even if plaintiff did not have diabetic neuropathy, he would still be incapable of earning suitable wages due to his admittedly compensable injury.
4. Plaintiff is disabled due to the compounding of his diabetic neuropathy with his low back radiculopathies. Apportionment is not permitted when an employee becomes totally and permanently disabled due to a compensable injury's aggravation or acceleration of the employee's non-disabling, pre-existing disease. Errante v. Cumberland County SolidWaste Management, 106 N.C. App. 114, 119, 415 S.E.2d 583, 586 (1992). In addition, in Counts v. Black Decker Corp., 121 N.C. App. 387,390-391, 465 S.E.2d 343, 346, disc. rev. denied, 343 N.C. 305,471 S.E.2d 68 (1996), the Court stated that "apportionment is not proper where the evidence before the Commission renders an attempt at apportionment between work-related and non-work related causes speculative or where there is no evidence attributing a percentage of the claimant's total incapacity [to work] to her compensable injury, and a percentage to the non-compensable condition."
5. As a direct result of the 27 June 1994 work-related injury, plaintiff became totally disabled beginning on 26 February 1999 and continuing. N.C. Gen. Stat. § 97-2.
6. As the result of his 27 June 1994 injury, plaintiff is entitled to have defendants pay ongoing total disability compensation at the rate of $466.00 per week, from 26 February 1999 and ongoing. N.C. Gen. Stat. § 97-29.
7. As the result of his 27 June 1994 injury by accident, plaintiff is entitled to have defendants pay for all related medical expenses incurred or to be incurred in the future which are reasonably required to effect a cure or provide relief. N.C. Gen. Stat. §§ 97-25; 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff ongoing total disability compensation at the rate of $466.00 per week for 26 February 1999 and ongoing. That portion of this award that has accrued shall be paid to plaintiff in a lump sum, subject to the attorney's fee approved below.
2. Defendants shall pay for all of plaintiff's medical expenses incurred or to be incurred in the future which are related to his compensable injury and which are reasonably required to effect a cure or provide relief.
3. A reasonable attorney's fee of 25% of the compensation awarded herein is approved for counsel for plaintiff. From the compensation having accrued, this fee shall be deducted from the amounts due plaintiff and paid directly to counsel for plaintiff. Thereafter, defendants shall send every fourth compensation check directly to plaintiff's counsel.
4. Defendants shall pay the costs of this action.
 *********** ORDER
Defendants' Motion to Dismiss is hereby DENIED.
This the ___ day of March 2004.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ LAURA K. MAVRETIC COMMISSIONER